889 So.2d 135 (2004)
E.F., Appellant,
v.
The STATE of Florida, Appellee.
No. 3D04-721.
District Court of Appeal of Florida, Third District.
December 1, 2004.
*136 Bennett H. Brummer, Public Defender, and Marti Rothenberg, Assistant Public Defender, for appellant.
Charles J. Crist, Jr., Attorney General, and Michael E. Hantman, Assistant Attorney General, for appellee.
Before LEVY, FLETCHER, and RAMIREZ, JJ.
RAMIREZ, J.
E.F., the respondent in the circuit court, appeals the circuit court's order sustaining the general master's report involuntarily committing E.F. and ordering that E.F. be transferred to a mental health facility. Because we find that the State failed to prove by clear and convincing evidence that E.F.'s delusion poses a real and present threat of substantial harm to his well-being or to the safety of others as required by the Corrections Mental Health Act for involuntary commitment, we reverse.
E.F. is an inmate at the South Florida Reception Center. He was convicted of attempted sexual battery and sentenced to thirty years in prison in 1988. In 2003, the warden of the South Florida Reception Center recommended that E.F. be admitted to the Department of Corrections Mental Health Institution for mental health care and treatment pursuant to the criteria outlined in sections 945.40-49, Florida Statutes (2003), Florida's Corrections Mental Health Act. The opinions of two psychiatrists, Dr. Esteven Valdes-Castillo and Dr. Juan A. Badia, supported the warden's recommendation.
At the subsequent commitment hearing for E.F.'s involuntary placement, Dr. Valdes-Castillo testified on the State's behalf before the general master that E.F. *137 was a schizophrenia type, and he was assigned to treat E.F. at the Department of Corrections Stabilization Unit South Florida Reception Center. However, he was not treating E.F. because E.F. refused treatment. He also was not prescribing any medications because E.F. had verbally expressed his desire not to take medications. On direct examination, Dr. Valdes-Castillo testified, in pertinent part, as follows:
Q. How has he been acting during the time he has been under your watchful eye?
A. Okay. He is a rather passive individual. He stays by himself, talks very little. When you approach him he always says, "I am okay" and won't do any interaction. My observation, he carries on his own conversation actively obviously actively responding to internal stimuli. He laughs and talks by himself. Although when I ask him, "Are you hearing voices now," he says, "No." "Now, then who were you talking to?" He laughs and then avoids giving me any information about that.
Q. How does he eat?
A. He eats well. He sleeps well and there is no physical problems.
Q. Do you believe there is a substantial likelihood in the future that he could inflict serious bodily harm on himself?
A. I would say he wouldn't do it directly. He wouldn't hurt himself. He is a high risk and that is why I am bringing him. He has delusions that he is already a free man that is free to go home. He cannot realize why we are keeping him. It is like we are kidnapping him. I confront him and he says, "I am already a free man." I even brought one of our classification officers, which is a very nice lady Mrs. Roma. She confronted him and she tells him his time to leave prison was not until July of 2007. He got angry at her and she didn't know what she was talking about.
My concern is that this man believes that he is a free man and one day will try to get out of the prison and will be shot, and they will do that. I have seen a few cases where they have tried to run out and they stop them with electrical fences. So he can be harmed not of his own desire to harm himself. He is not suicidal in my opinion.
Q. So you believe that acting on delusions could present a substantial likelihood in the future that he would inflict harm on others?
A. No, he has not shown any violent behavior toward anyone.
Although Dr. Valdes-Castillo testified that it was "highly possible" that E.F. would try to walk out of prison, and that he could very well hit the electrical fence, the doctor admitted that E.F. had never tried to escape.
The State argued that it had proven by clear and convincing evidence that E.F. met the criteria for involuntary treatment because he had a long mental history going back to 1988, he voluntarily stays to himself, he has conversations with himself in response to internal stimuli, he has delusions that he is a free man and he may then try to walk out of the prison one day and get shot or shocked by the electric fence. Thus, there was a substantial likelihood in the near future that he would inflict serious bodily harm on himself.
The defense argued that the State failed to show that there was a real and present threat of substantial harm to E.F.'s well being or the safety of others. The defense contended that the State was using the civil Baker Act criteria rather than the Corrections Mental Health criteria, which required the State to show the "mental illness poses a real and present threat of *138 substantial harm to the inmate's well being or to the safety of others."
The general master involuntarily committed E.F., stating that if he did not, E.F. might try to escape. Thus, it was better to prevent E.F. from being shot or electrocuted if he tried to escape. The general master thereafter recommended that E.F. be transferred to the Corrections Mental Health Facility. E.F. filed a written report taking exceptions to the general master's findings, claiming there was insufficient evidence that he stated he was leaving on a regular basis and that he had a long history of mental illness, and that he did not need care and treatment according to section 945.42(5).
At the exceptions hearing before the circuit court judge, no new witnesses were called and no new evidence was presented. The trial court thereafter sustained the general master's report and overruled E.F.'s exceptions to the report, stating that the general master's findings of fact and conclusions of law were based on competent and substantial evidence.
We hold that the State failed to prove by clear and convincing evidence that his delusion that he is a free man posed a real and present threat of substantial harm to his well-being or to the safety of others as required by sections 945.42(5) and 945.43, Florida Statutes (2003), for involuntary commitment to a corrections mental health facility.
Section 945.43, Florida Statutes (2003), outlines the criteria under which an inmate at a correctional institution may be involuntarily transferred to a corrections mental health facility for involuntary treatment. That section provides, in pertinent part:
945.43. Admission of inmate to mental health treatment facility. 
(1) CRITERIA.  An inmate may be admitted to a mental health treatment facility if he or she is mentally ill and is in need of care and treatment.
(2) ADMISSION TO A MENTAL HEALTH TREATMENT FACILITY. 
* * *
(c) ... The hearing shall be held in the same county, and one of the inmate's physicians at the facility shall appear as a witness at the hearing. If the court finds that the inmate is mentally ill and in need of care and treatment, it shall order that he or she be admitted to a mental health treatment facility ... The court shall authorize the mental health treatment facility to retain the inmate for up to 6 months.
(3) PROCEDURE FOR HEARING ON TRANSFER OF AN INMATE FOR MENTAL HEALTH TREATMENT. 
... If, at the hearing, the court finds that the inmate is mentally ill and in need of care and treatment, it shall order that he or she be transferred to a mental health treatment facility and provided appropriate treatment....
In addition, section 945.42(5), Florida Statutes (2003), defines "in need of care and treatment" as follows:
(5) "In need of care and treatment" means that an inmate has a mental illness for which inpatient services in a mental health treatment facility are necessary, which mental illness poses a real and present threat of substantial harm to the inmate's well-being or to the safety of others.
Consequently, to transfer E.F. involuntarily to a mental health treatment facility, the State needs to show that E.F. (1) has a mental illness for which inpatient services in a mental health treatment facility are necessary; (2) the mental illness must *139 pose a real and present threat of substantial harm; (3) to the inmate's well-being or to the safety of others.
In the case before us, the State failed to meet the statutory criteria. As may be seen from Dr. Valdes-Castillo's testimony at the commitment hearing, his fear that E.F. might try to escape is, first, not supported by the evidence, and second, insufficient to meet the criteria that E.F.'s mental illness poses a real and present threat of substantial harm to his well-being or to the safety of others.
Accordingly, the general master's findings of facts and conclusions of law and the circuit court's order sustaining the general master's report are not based on competent substantial evidence. The State has thus failed to prove by clear and convincing evidence that E.F. meets the criteria for involuntary transfer to a corrections mental health treatment facility.
The Corrections Mental Health Act, sections 945.40-49, Florida Statutes, does not set forth the evidentiary standard for commitment, unlike civil commitments pursuant to Florida Statutes, Chapter 394, Florida's Mental Health Act, also known as the Baker Act. Section 394.467(1) of the Baker Act sets forth the evidentiary standard for commitment of clear and convincing evidence. We agree with E.F. that it is reasonable to use this standard in commitments under the Corrections Mental Health Act. For the State to meet the clear and convincing standard, the evidence must "be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983).
In Boller v. State, 775 So.2d 408, 409 (Fla. 1st DCA 2000), the court stated that "the need for treatment and medication and the refusal to take psychotropic medication despite a deteriorating mental condition, standing alone, do not justify involuntary commitment under the Baker Act." In addition, "[c]onclusory testimony, unsubstantiated by facts in evidence, that a patient has ... the possibility of substantial harm to herself, is insufficient to satisfy the statutory criteria by the clear and convincing evidence standard." Id. at 410.
Here, the record lacks clear and convincing evidence that E.F.'s delusion that he is a free man poses a real and present threat of escape and consequently substantial harm to his well-being. Because the State has failed to meet its burden of proof, we agree with E.F. that he should not be involuntarily committed and therefore reverse the circuit court's order involuntarily committing him to the corrections mental health facility.
Reversed.
FLETCHER, J., concurs.
LEVY, J., dissents.